A.M. SANTOS LAW, CHTD.
Antony M. Santos, Esq.
Nevada Bar No. 11265
3275 S. Jones Blvd. Ste. 104
Las Vegas, Nevada 89146
Phone:    (702) 749-4594
Facsimile: (702) 543-4855
tony@amsantoslaw.com

SMITH CORRELL LLP
Mark L. Smith, Esq.
Cal. Bar No. 213829 (pro hac vice application to be filed)
11766 Wilshire Blvd., Suite 1670
Los Angeles, CA 90025
Telephone: (213) 443-6222
Facsimile: (877) 730-5910
msmith@smithcorrell.com

Attorneys for Plaintiffs Reflex Media, Inc.
and InfoStream Group, Inc.

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| REFLEX MEDIA, INC., a Nevada corporation, and INFOSTREAM GROUP, INC., a Nevada corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> OLIGARCH, LLC, a Nevada Limited Liability Company; COBIA SYSTEMS, INC., a Washington Corporation; DMA FINANCIAL CORP., a Nevada Corporation; FORLEX SALES, INC., a Nevada Corporation; NATASHA ZUKOVSKI, an individual; LEAH GARRETT, an individual; NICK PINKOWSKI, an individual; DEVANAND SHARMA, an individual; DARRIN LANDAU, an individual; ALEXANDER ZUKOVSKI, an individual; GREGORY ZUKOVSKI, an individual; VIBRA JESSEN, an individual; KIRSTEN JOHNSON, an individual; and DOES 1-50, inclusive, <br><br> Defendants. | Case No.:   2:15-cv-1147 <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Reflex Media, Inc., d/b/a SeekingArrangement.com, ("Reflex") and InfoStream Group, Inc. ("InfoStream") (collectively, "Plaintiffs" for their relevant periods during which they controlled the intellectual property and rights at issue herein) hereby complains against

1    defendants Oligarch, LLC, Cobia Systems, Inc., DMA Financial Corp., Forlex Sales, Inc.,

2    Natasha Zukovski, Leah Garrett, Nick Pinkowski, Devanand Sharma, Darrin Landau, Alexander

3    Zukovski, Gregory Zukovski, Vibra Jessen, Kirsten Johnson, and Does 1-50, inclusive

4    (collectively, "Defendants"), alleging as follows:

5    **PARTIES, JURISDICTION AND VENUE**

6        1.    Reflex Media, Inc. d/b/a SeekingArrangement.com is, and at all material times

7    hereto was, a corporation organized and existing under the laws of the State of Nevada, with its

8    principal place of business in Las Vegas, Nevada.  Reflex is the exclusive licensee of and

9    operates SeekingArrangement.com.

10        2.    InfoStream Group, Inc. is, and at all material times hereto was, a corporation

11    organized and existing under the laws of the State of Nevada, with its principal place of business

12    in Las Vegas, Nevada. InfoStream exclusively controlled SeekingArrangement.com prior to

13    Reflex.

14        3.    On information and belief, defendant Oligarch, LLC is, and at all material times

15    hereto was, a limited liability company organized and existing under the laws of the State of

16    Nevada, with its principal place of business in Las Vegas, Nevada.  On information and belief,

17    defendant Oligarch, LLC owns and/or operates the infringing website, OnMutualTerms.com.

18        4.    On information and belief, defendant Cobia Systems, Inc. is and at all material

19    times hereto was, a corporation organized and existing under the laws of the State of

20    Washington, with its principal place of business in Seattle, Washington.  On information and

21    belief, defendant Cobia Systems, Inc. is affiliated with the infringing website,

22    OnMutualTerms.com, and has actively participated in and benefitted from the wrongful acts

23    alleged herein.

24        5.    On information and belief, defendant DMA Financial Corp. is, and at all material

25    times hereto was, a Corporation organized and existing under the laws of the State of Nevada,

26    with its principal place of business in Las Vegas, Nevada.  On information and belief, DMA

27    Financial Corp. owns the web domain, AnArrangement.com, which redirects to the infringing

28    website, OnMutualTerms.com.

6.     On information and belief, defendant Forlex Sales, Inc. is a Corporation organized and existing under the laws of the State of Nevada with its principal place of business in Las Vegas, Nevada.   On information and belief, defendant Forlex Sales, Inc. is affiliated with defendant Oligarch, LLC and the infringing website, OnMutualTerms.com, and has actively participated in and benefitted from the wrongful acts alleged herein.  On information and belief, there is an overlap in ownership between defendants Forlex Sales, Inc. and Oligarch, LLC, and defendant Forlex Sales, Inc. directs its employees to do work for the benefit of OnMutualTerms.com.

7.     On information and belief, defendant Natasha Zukovski is an individual who resides in Las Vegas, Nevada.  On information and belief, defendant Zukovski is a manager of defendant Oligarch, LLC.

8.     On information and belief, defendant Leah Garrett is an individual who resides in Henderson, Nevada.   On information and belief, defendant Garrett is the registrant of the infringing domain, OnMutualTerms.com.  On information and belief, defendant Garrett is also the registrant of the domain, AnArrangement.com, which redirects to the infringing domain, OnMutualTerms.com.

9.     On information and belief, defendant Nick Pinkowski is an individual who resides in Las Vegas, Nevada.   On information and belief, defendant Pinkowski is a manager of defendant Oligarch, LLC.

10.     On information and belief, defendant Devanand Sharma is an individual who resides in Seattle, Washington.  Defendant Sharma is a former employee of InfoStream and, on information and belief, is the Co-Founder and CEO of defendant Cobia Systems, Inc.

11.     On information and belief, defendant Darrin Landau is an individual who resides in Las Vegas, Nevada.  On information and belief, defendant Landau is the President and a Director of defendant DMA Financial Corp.

12.     On information and belief, defendant Alexander Zukovski is an individual who resides in Las Vegas, Nevada.  On information and belief, defendant Alexander Zukovski is the

Secretary of defendant DMA Financial Corp., and the President, Treasurer, and a director of defendant Forlex Sales, Inc.

13.  On information and belief, defendant Gregory Zukovski is an individual who resides in Las Vegas, Nevada.  On information and belief, defendant Gregory Zukovski is the Treasurer and a director of defendant DMA Financial Corp., and a director of defendant Forlex Sales, Inc.

14.  On information and belief, defendant Vibra Jessen is an individual who resides in Las Vegas, Nevada.  On information and belief, defendant Jessen is the Secretary and a director of defendant Forlex Sales, Inc.

15.  On information and belief, defendant Kirsten Johnson is an individual who resides in Las Vegas, Nevada.  Defendant Johnson is a former employee of InfoStream and, on information and belief, is currently the Public Relations/Marketing Manager for the infringing website, OnMutualTerms.com.

16.  Plaintiffs do not presently know the true names and capacities of the defendants named herein as Does 1 through 50, inclusive.  Plaintiffs will seek leave to amend this Complaint to allege said defendants' true names and capacities as soon as they are ascertained.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named defendants Does 1 through 50 participated in and is in some manner responsible for the acts alleged in this Complaint and the damages resulting therefrom.

17.  Plaintiffs are informed and believe that at all times referenced herein, each Defendant was the agent, employee, partner, co-venturer, successor-in-interest, alter ego, and/or co-conspirator of each and all of the other Defendants and was acting within the course and scope of said agency, employment, partnership, co-venture, relationship and/or conspiracy. Plaintiffs are informed and believe, and on that basis allege, that each Defendant acted in concert with, and with the consent of, each of the other Defendants, and that each Defendant ratified or agreed to accept the benefits of the conduct of each of the other Defendants.  Plaintiffs are further informed and believe, and on that basis allege, that each Defendant actively and knowingly participated in the furtherance of the wrongful acts alleged herein, directed the

1   wrongful acts alleged herein, benefited from the wrongful acts alleged herein, and/or used the

2   entity defendants in a willful and intentional manner to carry out the wrongful acts alleged

3   herein.

4           18.     This Court has jurisdiction over the subject matter of this action pursuant to 28

5   U.S.C. § 1331; 1338(a); and 1338(b) because Plaintiffs' claims arise under the Lanham

6   Trademark Act, 15 U.S.C. § 1051, *et seq*., and further present a claim of unfair competition

7   joined with a substantial and related claim under the trademark laws. This Court has jurisdiction

8   over the state law claims pursuant to 28 U.S.C. § 1367 under the doctrine of supplemental

9   jurisdiction.

10          19.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) and (3) because a

11  substantial part of the events and omissions giving rise to the claims asserted herein occurred

12  within this judicial district, substantial injury occurred in this district, and Defendants are

13  otherwise subject to the Court's personal jurisdiction in this district.

14          20.     Personal jurisdiction exists over Defendants because Defendants conduct business

15  in Nevada and in this judicial district, or otherwise avail themselves of the privileges and

16  protections of the laws of the State of Nevada, such that traditional notions of fair play and due

17  process are not offended by this Court's exercise of jurisdiction over Defendants.

18  <u>**GENERAL ALLEGATIONS**</u>

19  **Plaintiffs Create a Profitable Business Using Its Trademarks and Trade Dress**

20          21.     Reflex is the exclusive licensee of and operates SeekingArrangement.com.  And

21  since as early as 2006, Plaintiffs have owned and operated a number of dating websites,

22  including   SeekingArrangement.com,   SeekingMillionaire.com,   MissTravel.com,   and

23  CarrotDating.com, that promote and facilitate niche dating, specifically "sugar daddy dating."

24  Sugar daddy dating involves matching generous benefactors willing to pamper and offer

25  financial assistance or gifts to younger attractive partners in return for their friendship or

26  companionship.

27          22.     SeekingArrangement.com features a unique business model that differentiates its

28  users as either: a) "Sugar Daddy" or "Sugar Momma" (those who are willing to pamper)

("Benefactor(s)") and b) "Sugar Babies" (those who seek the companionship of a Benefactor) ("Attractive Member(s)"). SeekingArrangement.com does not charge subscription fees to its Attractive Members, who are able to "Join Free."  Instead, Benefactors purchase "credits" which are then used to "unlock" communications with Attractive Members.  Attractive Members may use the website for free or may purchase a membership subscription to access premium features and be prominently featured to Benefactors.

23.    Because of its unique business model, whereby SeekingArrangement.com charges Benefactors while allowing Attractive Members to use the website for free, the website has been successful in attracting a higher number of Attractive Members to sign up, resulting in a higher female Attractive Member to male Benefactor ratio.  A higher female to male ratio is critical to the website's ability to attracting more Benefactors and to creating a better user experience.

24.    In the time SeekingArrangement.com has operated, it has attracted the attention of numerous media outlets including *Time, Forbes, The Atlantic, ABC News, CNN, MSNBC, the San Francisco Chronicle,* and *Fox News Channel*. The website became an instant success growing to tens of thousands of paying users.

25.    Plaintiffs have invested hundreds of thousands of dollars to promote the look and feel of SeekingArrangement.com and its associated trademarks. As a result, the website and its use of the mark, MUTUALLY BENEFICIAL RELATIONSHIPS, have become synonymous with Plaintiffs' business and the high quality product that SeekingArrangement.com provides.

26.    Because of this publicity and Plaintiffs' substantial expenditures on advertising, SeekingArrangement.com has become a well-known and recognizable worldwide brand and is associated in the minds of consumers with online dating.

27.    Plaintiffs' other online dating websites, SeekingMillionaire.com, MissTravel.com, and CarrotDating.com, similarly act as an elite matchmaking service between financially successful and beautiful partners. In short, SeekingArrangement.com uses its marketing in a way that benefits from and builds off the brand established by those famous and high quality websites to add additional users and increase its market recognition and trademark association.

**Plaintiffs Have Obtained Legal Protection for Trademarks Associated with**

**SeekingArrangement.com**

28.     Plaintiffs have operated, during their respective periods, the website SeekingArrangement.com in connection with the promotion, advertising, and sale of its services, and operated the website before the acts of Defendants complained of herein.

29.     In order to protect the investment in its brand and online dating business, Plaintiffs have sought and received federal registration for the trademark MUTUALLY BENEFICIAL RELATIONSHIPS.

30.     Since at least August 3, 2006, Plaintiffs have continually used the MUTUALLY BENEFICIAL RELATIONSHIPS mark in commerce since 2006 to promote its online dating goods and services, well before the acts of Defendants complained of herein.

31.     On June 8, 2009, InfoStream applied for federal registration of the MUTUALLY BENEFICIAL RELATIONSHIPS trademark.   United States Trademark Registration No. 3,736,566 was issued on June 12, 2010.

32.     On January 12, 2015, the MUTUALLY BENEFICIAL RELATIONSHIPS trademark became incontestable.

33.     On May 25, 2007, InfoStream applied for federal registration of the SEEKING ARRANGEMENT trademark.  United States Trademark Registration No. 3,377,772 was issued on February 5, 2008.

34.     On February 5, 2013, the SEEKING ARRANGEMENT trademark became incontestable.  Plaintiffs have continuously used the SEEKING ARRANGEMENT mark in commerce since 2006 to promote its online dating goods and services, well before the acts of Defendants complained of herein.

35.     On January 24, 2013, InfoStream applied for federal registration of the MUTUALLY BENEFICIAL ARRANGEMENTS trademark.   United States Trademark Registration Serial No. 85832002.   Plaintiffs have continuously used the MUTUALLY BENEFICIAL ARRANGEMENTS   mark in commerce since 2006 to promote its online dating goods and services, well before the acts of Defendants complained of herein.

36.     On January 24, 2013, InfoStream applied for federal registration of the MUTUALLY BENEFICIAL DATING trademark.  United States Trademark Registration Serial No. 85831996.  Plaintiffs have continuously used the MUTUALLY BENEFICIAL DATING mark in commerce since January 1, 2013 to promote its online dating goods and services, well before the acts of Defendants complained of herein.

37.     On March 24, 2014, InfoStream applied for federal registration of the RELATIONSHIP ON YOUR TERMS trademark.  United States Trademark Registration Serial No. 86234736.  Plaintiffs have continuously used the RELATIONSHIP ON YOUR TERMS mark in commerce to promote its online dating goods and services, well before the acts of Defendants complained of herein.

38.     Plaintiffs' foregoing marks have acquired secondary meaning and inherent distinctiveness.

39.     Moreover, Plaintiffs spent hundreds of thousands of dollars and expended years of effort beginning in 2006, in advertising, promoting and developing its trademarks relating to its online sugar daddy dating websites throughout the United States and internationally, which efforts and trademarks became associated with SeekingArrangement.com once the website was launched, immediately raising its profile and recognition among the general consuming public.  As a result of such advertising and expenditures, Plaintiffs have created famous marks that are recognized throughout industry and by the general consuming public.  Plaintiffs have established considerable goodwill in its trademarks, which are valuable assets of Plaintiffs and are of substantial worth to Plaintiffs.

### Defendants' Trademark Infringement and Unfair Competition

40.     After SeekingArrangement.com launched and immediately became profitable and commercially successful, and after Plaintiffs' marks became famous, Defendants began to advertise and promote their own online dating website, OnMutualTerms.com, to directly compete against SeekingArrangement.com.  OnMutualTerms.com copies the defining and unique aspect of SeekingArrangement.com, *i.e.*, it involves matching generous benefactors willing to pamper and offer financial assistance or gifts to younger attractive partners in return

1    for their friendship or companionship.

2         41.    Defendants are infringing upon Plaintiffs' foregoing trademarks, including MUTUALLY BENEFICIAL RELATIONSHIPS and RELATIONSHIP ON YOUR TERMS, by using a confusingly similar mark, ON MUTUAL TERMS.

         42.    The homepage for OnMutualTerms.com uses the mark ON MUTUAL TERMS in its URL prominently on the left hand side and in the center of the page.  Such use is confusingly similar to Plaintiffs' marks, MUTUALLY BENEFICIAL RELATIONSHIPS and RELATIONSHIP ON YOUR TERMS.

         43.    Defendants further infringe upon Plaintiffs' trademarks in the meta description of Defendants' website, OnMutualTerms.com.  The meta description used by OnMutualTerms.com states, "Learn why more than 1 million people have chosen the Sugar Daddy route where Sugar Babies and Sugar Daddies sign up for mutually beneficial arrangements." This is a direct copy of the meta description first used by Plaintiffs' website, SeekingArrangement.com, which states, "Learn why more than 3.6 million people have chosen the Sugar Daddy route where Sugar Babies and Sugar Daddies sign up for mutually beneficial arrangements."

         44.    Defendants are infringing upon Plaintiffs' trademark, MUTUALLY BENEFICIAL ARRANGEMENTS, by using the same mark in the meta description of OnMutualTerms.com.

         45.    Furthermore, the HTML source code for OnMutualTerms.com as of March 14, 2015 shows another meta description used by OnMutualTerms.com: "Sugar Daddy and Sugar Baby online dating. Featured in the Wash, Dr. Phil, 20/20 & CNN, OnMutualTerms is the leading Sugar Daddy Dating website."  This is a direct copy of the meta description first used by Plaintiffs' website, SeekingArrangement.com, which states: "Sugar Daddy and Sugar Baby online dating. Featured in the NY Times, Dr. Phil, 20/20 & CNN, SeekingArrangement is the leading Sugar Daddy Dating website."

         46.    While the Plaintiffs' website, SeekingArrangement.com, has in fact been featured in Dr. Phil, 20/20 and CNN, the Defendants' website, OnMutualTerms.com, has not.  On information and belief, Defendants' plagiarism of Plaintiffs' meta description was done with an

1  intent to deceive the purchasing public and/or others in the trade into falsely believing that

2  Defendants' website, OnMutualTerms.com, is related to Plaintiffs' SeekingArrangement.com

3  and, therefore, has credibility, when it does not.

4    47.    The HTML source code for OnMutualTerms.com as of March 14, 2015, shows

5  the use of meta headline: "Sugar Daddy Dating, Mutually Beneficial Relationships," which is an

6  exact copy of the meta headline first used by Plaintiffs' SeekingArrangement.com.

7    48.    Defendants    are    infringing    upon    Plaintiffs'    trademark,    MUTUALLY

8  BENEFICIAL RELATIONSHIPS, by using the same mark in the meta description of

9  OnMutualTerms.com.

10    49.    Furthermore, the title at the top of each page on OnMutualTerms.com is: "Sugar

11  Daddy Dating – Sugar Babies Seeking Arrangement with wealthy successful men on the #1

12  sugar daddy site."    Defendants are infringing upon Plaintiffs' trademark, SEEKING

13  ARRANGEMENT, by use of the same mark in the title of Defendants' website,

14  OnMutualTerms.com.

15    **Defendants' Trade Dress Infringement and Unfair Competition**

16    50.    In addition to infringing upon Plaintiffs' trademarks, Defendants have infringed

17  upon Plaintiffs' trade dress – the visual manner in which its goods and services are presented to

18  prospective consumers – by copying the visual elements and look and feel of Plaintiffs' website,

19  SeekingArrangement.com, on OnMutualTerms.com.

20    51.    Plaintiffs    own    protected    trade    dress    associated    with    the    website

21  SeekingArrangement.com.  The website contains an arrangement of identifying visual elements

22  and an overall mood, style and impression intended to make the source of Plaintiffs' services

23  distinguishable from other services and to promote Plaintiffs' services.  Plaintiffs' trade dress

24  produces an intuitive association with SeekingArrangement.com and its high reputation.

25    52.    The foregoing look and feel of SeekingArrangement.com's external web pages,

26  includes, *inter alia*, the font, placement of links, the name of the website,

27  "SeekingArrangement," located in the top left-hand corner of the webpage, a photograph of a

28  well-dressed man admiring his partner while in close proximity predominating the top of the

1   page accompanied by a verbiage regarding the "terms" of the relationship, a photographic matrix

2   of "sugar babies" appearing above a photographic matrix of "sugar daddies," with text next to

3   the images explaining the difference between the types of users, a banner touting the availability

4   of background checks located below the photographic matrixes, and a text-box layout to sign up

5   for free.

6        53.    OnMutualTerms.com has copied the look and feel of SeekingArrangement.com's

7   external web pages including, *inter alia*, use of a similar font, placement of the website name,

8   "OnMutualTerms.com," in the top left-hand corner of the webpage, a photograph of a well-

9   dressed man admiring his partner while in close proximity predominating the top of the page

10   accompanied by a verbiage regarding the "terms" of the relationship, a photographic matrix of

11   "sugar babies" appearing above a photographic matrix of "sugar daddies," with text next to the

12   images explaining the difference between the types of users, a banner touting the availability of

13   background checks located below the photographic matrixes, and a text-box layout to sign up for

14   free.

15        54.    The look and feel of SeekingArrangement.com's member web pages, includes,

16   *inter alia*, a website logo on the left side header, followed by search, message and interests menu

17   items in the middle, an upgrade button and a settings button that features "Account," "Profile,"

18   Help," "Logout," and "Upgrade" choices on the right side header, and a side column featuring

19   the user's profile photo, username, user type, followed by "Our Blog" topics.

20        55.    OnMutualTerms.com has also copied the look and feel of

21   SeekingArrangement.com's member web pages including, *inter alia*, a website logo on the left

22   side header, followed by browse (similar to search), message and favorite (similar to interests)

23   menu items in the middle, an upgrade button and a settings button that features "Account," "Edit

24   Profile" (similar to Profile), "Support" (similar to help), "Settings," and "Logout" on the right

25   side header, and a similar side column featuring the user's profile photo, username, user type,

26   followed by "Our Blog" topics.

27        56.    The look and feel of SeekingArrangement.com's member search page includes,

28   *inter alia*, search filters on the left column featuring search by location, followed by body type,

age, ethnicity, height, eye color, hair color, smoking, drinking, relationship, and education.  On the top right corner, there are options to sort by newest profile, oldest profile and most recently active profile. Below that, radio buttons allowing users the ability to filter by profiles with photos, background check, premium, unviewed, viewed, viewed me, favorited, and favorited me.

57. OnMutualTerms.com has also copied the look and feel of SeekingArrangement.com's member search page including, *inter alia*, similar search filters on the left column featuring search by location, followed by body type, age, height, eye color, hair color, smoking, drinking, education (in an order very similar to that on SeekingArrangement.com).  Moreover, in the top left corner is a similar sort option offering the same choices as SeekingArrangement.com. Similarly, below that, radio buttons allowing users the ability to filter by profiles with photos, background check, premium, unviewed, viewed, viewed me, favorited, and favorited me.

58. The look and feel of SeekingArrangement.com's member profile pages include, *inter alia*, a profile photo on the top left corner and username in the middle, followed by age, location, and headline, and further followed by when the user was last active, date the user joined and location the user logged in from (a feature that is unique to SeekingArrangement.com since its launch in 2006).  On the right corner are buttons to message and favorite, and options to block and report the user. This is followed by the profile fields on the left column – height, body type, ethnicity, hair color, eye color, interested in, education, occupation, relationship, children, smoking, drinking and lifestyle expectations.  In the body is a section entitled, "About Me," followed by "What I'm Looking For."

59. OnMutualTerms.com has also copied the look and feel of SeekingArrangement.com's member profile pages including, *inter alia*, showing a profile photo on the top left corner and username in the middle, followed by age, location, and headline, and further followed by when the user was last active, date the user joined and location the user logged in from (a feature that is unique to SeekingArrangement.com since its launch in 2006). On the right corner are buttons to message and favorite, and options to block and report the user. This is followed by the profile fields on the left column in the same order as

SeekingArrangement.com – height, body type, ethnicity, hair color, eye color, interested in, education, occupation, relationship, children, smoking, drinking and lifestyle expectations.  In the body is a section entitled, "About Me," followed by "What I'm Looking For."

60.    SeekingArrangement.com's trade dress, or total image and overall appearance, as represented by its visual and interface design, is inherently distinctive and has, over time, also acquired secondary meaning. The public associates the unique screen images and layout that comprises the trade dress of SeekingArrangement.com with Plaintiffs' goods, services and reputation. This is a result of SeekingArrangement.com's inherent distinctiveness and distinctiveness acquired through extensive advertising, sales, unsolicited media attention, and use in commerce throughout the United States.

61.    The overall look and feel of SeekingArrangement.com is non-functional. SeekingArrangement.com's trade dress elements, encompassing the website's text, font, fields, colors, graphics and layout as a whole, are not essential to the purpose of the services of SeekingArrangement.com, do not affect the cost or quality of its services, and do not constitute the actual benefit the user wishes to purchase.

**Likelihood of Confusion and Harm to Plaintiffs' Business**

62.    On information and belief, OnMutualTerms.com, which uses marks identical or confusingly similar to Plaintiffs' trademark's, as well as Plaintiffs' trade dress or confusingly similar elements, is of substantially inferior quality to Plaintiffs' famous SeekingArrangement.com website and associated services such that Plaintiffs' trademarks and trade dress will suffer, and have suffered, negative associations through Defendants' unauthorized use.

63.    Defendants' use of Plaintiffs' trade dress and identical or confusingly similar trademark for a similar or identical class of services, and distributed through the same channels of trade, is likely to confuse consumers, and has actually caused confusion. Defendants' use of Plaintiffs' trade dress, as well as identical or confusingly similar marks, is likely to lead consumers to conclude that OnMutualTerms.com was exclusively or jointly developed, licensed, or certified by, or is otherwise associated or affiliated with, SeekingArrangement.com.

64.     Consumers, especially those who learn about OnMutualTerms.com by word of mouth or by advertisements deliberately placed in venues where Plaintiffs have used the mark to advertise its goods and services, are likely to be misled as to the source, sponsorship, or affiliation of OnMutualTerms.com and associated goods and services.

65.     Accordingly, in this action Plaintiffs seek to permanently enjoin Defendants from using Plaintiffs' trade dress, as well as any confusingly similar marks, trade dress or domain names, for the marketing and/or sale of their dating services so that Plaintiffs' trademarks and trade dress can continue to serve as unique identifiers of a predictable nature and quality of goods or services coming from a single source.

66.     Defendants' unauthorized use of Plaintiffs' trademarks in connection with Defendants' comparatively inferior online dating services has diluted and continues to dilute Plaintiffs' mark by diminishing consumer capacity to associate the mark with the quality goods and services signified by Plaintiffs' marks.

**Defendants' Breach of SeekingArrangement.com's Terms of Use**

67.     Anyone who seeks to join SeekingArrangement.com's website at www.SeekingArrangement.com must signify that they have read and agree to be bound by its Terms of Use, "whether or not [they] register as a member." The Terms of Use "sets out the legally binding terms of use of the Website[.]" (*Id.*)

68.     Only those individuals who agree to the Terms of Use are authorized to join SeekingArrangement.com, thereby becoming a user.

69.     If a person fails to agree to the Terms of Use, that individual will be unable to register as a member and, therefore, is unable to gain access to the trade dress contained on Plaintiffs' member pages and infringed upon by Defendants as alleged above.

70.     In pertinent part, the Terms of Use provide:

**Section 4: Non-Commercial Use by Members**

The Website and the Service is for personal use only. Members may not use the Service in connection with any commercial endeavors. [ ]

**Section 7: Proprietary Rights**

SeekingArrangement.com owns and retains all proprietary rights in the Website and the Service, and in all content, trademarks, trade names, service marks, and other intellectual property rights related thereto. The Website contains the copyrighted material, trademarks, and other proprietary information of SeekingArrangement.com, and its licensors. Except for that information which is in the public domain or for which you have been given written permission, you may not copy, modify, publish, transmit, distribute, perform, display, or sell any such proprietary information.

**Section 10: Copyright Policy [ ]**

You may not post, distribute, or reproduce in any way any copyrighted material, trademarks, or other proprietary information without obtaining the prior written consent of the owner of such proprietary rights. [ ]

71.     Thus, all users of SeekingArrangement.com agree under the Terms of Use (1) not to use Plaintiffs' propriety information for commercial purposes, and only to use it for personal, non-commercial use; (2) not to copy, modify, publish, transmit, distribute, perform, display or sell any of Plaintiffs' proprietary information, including its trademarks and other intellectual property; and (3) not to post, distribute, or reproduce any trademarks.

72.     On information and belief, Defendants joined, accessed and logged into SeekingArrangement.com, and agreed to the Terms of Use, for the purpose of and with the intention to gain access to Plaintiffs' trade dress and other intellectual property.

73.     By and through the conduct alleged herein, Defendants' use and infringement of Plaintiffs' trademarks and trade dress have violated and continue to violate the Terms of Use.

**Defendants' False Advertising**

74.     Defendants' website, OnMutualTerms.com, predominately features the mark REDEFINING SUGAR followed by the ® symbol (i.e., REDEFINING SUGAR ®), although, on information and belief, Defendants do not own any active trademark registrations.

75.     On information and belief, Defendants do not currently own, and have never owned, a federal Registration for REDEFINING SUGAR.

- 15 -

76. Defendants' false use of the ® symbol with the REDEFINING SUGAR mark ("Defendants' False Registration Statements") is likely to deceive customers and potential customers into falsely believing that Defendants own an active Registration for REDEFINING SUGAR, when they do not.

77. Consumers are likely to believe that a company that owns a registered trademark is an established, trustworthy entity that sells a quality product and stands behind its services.

78. Defendants' False Registration Statements are literally false.

79. Defendants' False Registration Statements are impliedly false.

80. Defendants' False Registration Statements are material, in that they are likely to influence purchase decisions.

81. On information and belief, Defendants falsely used the ® symbol in connection with REDEFINING SUGAR with the intent to deceive consumers.

82. On information and belief, Defendants' False Registration Statements have been made with intent to deceive the purchasing public and/or others in the trade into falsely believing that Defendants own a Registration for REDEFINING SUGAR, and therefore, has superior rights in REDEFINING SUGAR, when it does not.

**Defendants' Misappropriation of Trade Secrets and Tortious Interference with**

**Contractual Relations**

83. On or about January 2009, InfoStream hired defendant Devanand Sharma as an employee to work as InfoStream's Director of Technology.

84. On or about January 2009, in connection with defendant Sharma's employment, defendant Sharma was asked to sign an "Employee Non-Compete Agreement" (the "Non-Compete Agreement"). A true and correct copy of the Non-Compete Agreement signed by defendant Sharma is attached hereto as Exhibit 1 and incorporated by this reference as though fully set forth herein.

85. Paragraph 3 of the Non-Compete Agreement is titled "CONFIDENTIALITY":

Employee acknowledges that Employer shall or may, in reliance upon this Agreement, grant Employee access to Employer's confidential and proprietary information.

Employee agrees not to disclose to any other person (unless required by law) or use for personal gain such confidential or proprietary information at any time during or after the termination of employment, unless Employer grants express, written consent of such a disclosure.

86.     Paragraph 5 of the Non-Compete Agreement, "CONTINUING OBLIGATIONS," provides that the Non-Compete Agreement and Confidentiality provisions continue in full force and effect following termination of the employee.

87.     On or about January 31, 2009, defendant Sharma also signed a separate "Confidential Information and Invention Assignment Agreement for Employee" (the "NDA"). A true and correct copy of the NDA signed by defendant Sharma is attached hereto as Exhibit 2 and incorporated by this reference as though fully set forth herein.  Pursuant to the NDA, defendant Sharma agreed to protect Plaintiffs' confidential information.

88.     While employed by InfoStream in the role of Director of Technology, defendant Sharma had access to and intimate knowledge of Plaintiffs' confidential information, including website source-code, database structures, marketing methodologies, operating processes and other trade secrets.

89.     On or about June 9, 2009, InfoStream terminated defendant Sharma's employment after discovering he had fabricated his qualifications.  In the resume defendant Sharma submitted to Plaintiff, he claimed falsely he had received a Bachelor's Degree in Business Administration and Computer Science from the University of Maryland, and a Master's degree in Computer Science from Massachusetts Institute of Technology (MIT).

90.     On information and belief, after being terminated by Plaintiff, defendant founded defendant Cobia Systems, Inc.  On information and belief, defendant Cobia Systems, Inc. is providing marketing services for the infringing website, OnMutualTerms.com.  On information and belief, defendant Sharma is currently serving as CEO of defendant Cobia Systems, Inc.

91.     On information and belief, defendants Sharma and Cobia Systems, Inc. misappropriated and disclosed confidential and proprietary information belonging to Plaintiffs to the other Defendants to assist them in the creation and operation of OnMutualTerms.com in

direct competition against Plaintiff.  On information and belief, the other Defendants knew that defendants Sharma and Cobia Systems, Inc. were prohibited from disclosing Plaintiffs' confidential and proprietary information to them, but nonetheless used Plaintiffs' confidential and proprietary information provided to them by defendants Sharma and Cobia Systems, Inc. in creating and operating OnMutualTerms.com.

92.  On or about June 2014, InfoStream hired defendant Kirsten Johnson as an employee to work as a Public Relations Manager.  From June 2014 until December 2014, defendant Johnson's role and responsibilities included serving as Plaintiffs' spokesperson, blogging, social networking, developing marketing strategies, writing press releases and media pitches, media and public relations.

93.  In connection with her employment, defendant Johnson was asked to sign an "Employee Non-Compete Agreement" (the "Non-Compete Agreement").  A true and correct copy of the Non-Compete Agreement executed by Johnson is attached hereto as Exhibit 3 and incorporated by this reference as though fully set forth herein.

94.  Paragraph 2 of the Non-Compete Agreement is titled, "NON-COMPETE:"

> Following the termination of employment with Employer for any reason, Employee agrees not to engage directly or indirectly in any business substantially similar to or in competition with the business of the Employer, its successors or assigns for a period of two years.  For purposes of this agreement, engaging in 'any business substantially similar to, or in competition with the business of Employer' shall mean: (i) engaging in a business as an owner, partner or agent; (ii) taking employment with a third party engaged in such business either as an employee, contractor or consultant; or (iii) soliciting customers for the benefit of a third party engaged in such business.

95.  Paragraph 3 of the Non-Compete Agreement contains a "CONFIDENTIALITY" provision:

> Employee acknowledges that Employer shall or may, in reliance upon this Agreement, grant Employee access to Employer's confidential and proprietary information. Employee agrees not to disclose to any other person (unless required by law) or use for

personal gain such confidential or proprietary information at any time during or after the termination of employment, unless Employer grants express, written consent of such a disclosure.

96.     Paragraph 5 of the Non-Compete Agreement, "CONTINUING OBLIGATIONS," provides that the Non-Compete Agreement and Confidentiality provisions continue in full force and effect following termination of the employee.

97.     Defendant Johnson executed the Non-Compete Agreement on or about June 9, 2014.

98.     Also on or about June 9, 2014, defendant Johnson signed a separate "Employee Confidentiality and Non-Disclosure Agreement" (the "NDA").  A true and correct copy of the NDA signed by defendant Johnson is attached hereto as Exhibit 4 and incorporated by this reference as though fully set forth herein.

99.     Pursuant to the NDA, defendant Johnson agreed to protect Plaintiffs' confidential information:

Company Information.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Company, any Confidential Information of the Company.  I understand that 'Confidential Information' means any Company proprietary information, technical data, trade secret or know-how, including, but not limited to, research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineerings, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly.

100.     Paragraph 2 of the NDA also contained a "Return of Property" provision that required defendant Johnson to return Plaintiffs' confidential information upon termination of her employment: "Upon termination of my employment, I will return to the Company, retaining no copies or notes, all documents relating to the Company's business including, but not limited to,

reports, abstracts, lists, correspondence, information, computer files, computer disks, and all other materials and all copies of such materials, obtained by me during my employment with the Company."

101.    Pursuant to Paragraph 3 of the NDA, defendant Johnson consented to InfoStream notifying any future or prospective employer about "any rights and obligations under the NDA.

102.    During the course of her employment, defendant Johnson had access to Plaintiffs' confidential and proprietary information, including but not limited to Plaintiffs' public relations and marketing information and materials, strategic plans and media contact emails.

103.    On or about December 8, 2014, InfoStream terminated defendant Johnson's employment for being a poor culture fit, spreading gossip, and being disrespectful and unprofessional. At that time, defendant Johnson was asked to sign a Termination Letter that outlined the reasons for her termination and stated, "Please understand that the terms of the non-disclosure and non-compete agreements you signed will still apply after today."

104.    On information and belief, shortly thereafter, the other Defendants offered defendant Johnson a job working on the website, OnMutualTerms.com, as the Public Relations/Marketing Manager.

105.    On information and belief, the other Defendants are fully aware that defendant Johnson was previously employed by Plaintiff, and specifically hired her to work on a product that directly competes with Plaintiffs in the "sugar daddy" dating niche.  On information and belief, the other Defendants knew from defendant Sharma that defendant Johnson – like all of Plaintiffs' employees – was required to sign a Non-Compete Agreement and NDA.  Yet, despite being fully aware of the existence of such agreements between InfoStream and defendant Johnson, the other Defendants intentionally interfered with Plaintiffs' contractual relations with defendant Johnson by hiring her, encouraging her to violate her contracts with Plaintiff, and encouraging her to steal and use Plaintiffs' intellectual property and trade secrets to the benefit of the website, OnMutualTerms.com.

106.    On information and belief, defendant Johnson has provided the other Defendants with confidential and proprietary information belonging to Plaintiff, including pitch strategies,

1    marketing plans, media pitches, blog topics, media outreach methodologies and social media

2    methodologies that Defendants have used to compete against Plaintiff.  On information and

3    belief, the other Defendants knew that defendant Johnson was prohibited from disclosing

4    Plaintiffs' confidential and proprietary information to them, but nonetheless used Plaintiffs'

5    confidential and proprietary information in creating and operating OnMutualTerms.com.

6    **FIRST CAUSE OF ACTION**

7    **FEDERAL TRADEMARK INFRINGEMENT**

8    **(15 U.S.C. §§ 1114(1))**

9    **(Against Defendants Oligarch, LLC, DMA Financial Corp., Natasha Zukovski, Leah
     Garrett, Nick Pinkowski, Darrin Landau, Alexander Zukovski, Gregory Zukovski, and**
10   **Does 1 through 50, inclusive)**

11        107.    Plaintiffs incorporate by this reference each and every allegation set forth in the

12   preceding paragraphs of this Complaint, as if fully set forth herein.

13        108.    As alleged herein, Plaintiffs are the owner or exclusive licensee valid, protectable

14   trademarks for their respective periods.

15        109.    Without Plaintiffs' consent, Defendants have used in commerce, in connection

16   with the sale, offering for sale, distribution or advertising of Defendants' goods and services,

17   marks identical or confusingly similar to Plaintiffs' marks in a manner that is likely to cause

18   confusion, mistake and/or deception with consumers that Defendants' goods and services are the

19   same as those of Plaintiff, and/or that Defendants' goods and services are somehow associated,

20   affiliated, connected, approved, authorized or sponsored by Plaintiff.

21        110.    Defendants acted with the intent to cause confusion, mistake, or deception with

22   consumers.

23        111.    Defendants' continued use of marks identical or confusingly similar to Plaintiffs'

24   mark has caused, and will continue to cause, irreparable harm and injury to Plaintiffs and to

25   Plaintiffs' reputation and goodwill for which Plaintiffs have no adequate remedy at law.  The

26   threat of future injury to consumers and to Plaintiffs' business, identity, goodwill and reputation

27   necessitates the award of injunctive relief to prevent Defendants' continued infringement of

28   Plaintiffs' marks.

112.    Defendants have unjustly profited from their infringement of Plaintiffs' marks.

113.    As a direct and proximate result of Defendants' infringing activities as alleged herein, Plaintiffs have suffered substantial damage in an amount to be proven at trial, but estimated to exceed $2,000,000.

114.    Defendants' infringement of Plaintiffs' trademark as alleged herein is an exceptional case and is intentional, entitling Plaintiffs to treble its actual damages and to an award of attorneys' fees under 15 U.S.C. §§ 1117(a) and 1117(b).

### SECOND CAUSE OF ACTION

**FEDERAL FALSE DESIGNATIONS, FALSE DESCRIPTIONS,**

**AND FALSE ADVERTISING**

**(15 U.S.C. § 1125(a))**

**(Against Defendants Oligarch, LLC, DMA Financial Corp., Natasha Zukovski, Leah Garrett, Nick Pinkowski, Darrin Landau, Alexander Zukovski, Gregory Zukovski, and Does 1 through 50, inclusive)**

115.    Plaintiffs incorporate by this reference each and every allegation set forth in the preceding paragraphs of this Complaint, as if fully set forth herein.

116.    Defendants' misuse of Plaintiffs' marks in commerce in connection with the goods and services offered on Defendants' website – including in commercial advertising and promotion of Defendants' website – constitutes a false designation of origin and/or a false or misleading representation that (1) is likely to cause confusion, mistake, or deception with consumers as to the affiliation, connection, or association between Defendants' website, OnMutualTerms.com, and Plaintiffs' website, SeekingArrangement.com; (2) is likely to cause confusion, mistake, or deception with consumers as to the origin of Defendants' goods and services and/or that Plaintiffs sponsors or approves of the goods and services offered on Defendants' website, OnMutualTerms.com; and/or (3) misrepresents the nature, characteristics, and/or qualities of the goods and services offered on Defendants' website, OnMutualTerms.com.

117.    Furthermore, Defendants' use of the ® symbol in connection with the mark, REDEFINING SUGAR, on OnMutualTerms.com when Defendants do not own a trademark registration for that mark constitutes a false or misleading statement of fact in interstate

commerce – including commercial advertising – about Defendants' website and the goods and services offered therein, including their nature, characteristics, qualities, and origin.

118.     Defendants' false use of the ® symbol with the REDEFINING SUGAR mark has deceived or had the capacity to deceive a substantial segment of potential consumers into falsely believing that Defendants own an active Registration for REDEFINING SUGAR, when they do not.

119.     Defendants' misuse of the ® symbol is material because consumers are likely to believe that a company that owns a registered trademark is an established, trustworthy entity that sells a quality product and stands behind its services, and is therefore likely to influence purchase decisions.

120.     Defendants' foregoing acts have caused, and will continue to cause, irreparable harm and injury to Plaintiffs and to Plaintiffs' reputation and goodwill for which Plaintiffs have no adequate remedy at law.  The threat of future injury to consumers and to Plaintiffs' business, identity, goodwill and reputation necessitates the award of injunctive relief to prevent Defendants' continued false advertising.

121.     Defendants have unjustly profited from their foregoing conduct.

122.     As a direct and proximate result of Defendants' foregoing conduct, Plaintiffs have suffered damages in an amount to be proven at trial, but estimated to exceed $2,000,000.

123.     Defendants' foregoing acts constitute an exceptional case and are intentional, entitling Plaintiffs to treble its actual damages and to an award of attorneys' fees.

### THIRD CAUSE OF ACTION

### TRADE DRESS INFRINGEMENT

### (15 U.S.C. § 1125(a))

**(Against Defendants Oligarch, LLC, DMA Financial Corp., Natasha Zukovski, Leah Garrett, Nick Pinkowski, Darrin Landau, Alexander Zukovski, Gregory Zukovski, and Does 1 through 50, inclusive)**

124.     Plaintiffs incorporate by this reference each and every allegation set forth in the preceding paragraphs of this Complaint, as if fully set forth herein.

125.    The look, feel and overall appearance of SeekingArrangement.com includes, *inter alia*, the website's layout, buttons, font, graphics, and text alleged herein.

126.    The look and feel and overall appearance of SeekingArrangement.com is inherently distinctive and has, over time, also acquired secondary meaning. The public associates the unique audiovisual design and overall combination of features, graphics and elements of SeekingArrangement.com with Plaintiffs' goods and services. This is a result of the website's inherent distinctiveness and the distinctiveness acquired through extensive advertising, sales, unsolicited media attention, and use in commerce throughout the United States.

127.    The look and feel and overall appearance of SeekingArrangement.com is non-functional, and Plaintiffs own or are exclusive licensee for their respective periods of it as trade dress.

128.    OnMutualTerms.com features the same or confusingly similar look and feel and overall appearance as SeekingArrangement.com, including but limited to the website's layout, buttons, font, graphics, and text as alleged herein, without Plaintiffs' consent.

129.    Defendants' imitation and use of Plaintiffs' trade dress, as alleged in herein, is likely to cause confusion among consumers as to the source, sponsorship, and/or affiliation of Defendants' website, or create confusion or deception that Plaintiffs approve of the goods and services offered on Defendant's website, all to Plaintiffs' detriment.

130.    Defendants' imitation and use of Plaintiffs' trade dress has caused, and will continue to cause, irreparable harm and injury to Plaintiffs and to Plaintiffs' reputation and goodwill for which Plaintiffs have no adequate remedy at law.  The threat of future injury to consumers and to Plaintiffs' business, identity, goodwill and reputation necessitates the award of injunctive relief to prevent Defendants' continued misuse of Plaintiffs' trade dress.

131.    Defendants have unjustly profited from their foregoing conduct.

132.    As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial, but estimated to exceed $2,000,000.

133.    Defendants' foregoing conduct constitutes an exceptional case and is intentional, entitling Plaintiffs to treble its actual damages and to an award of attorneys' fees.

## FOURTH CAUSE OF ACTION

### FEDERAL DILUTION OF FAMOUS MARKS

### (15 U.S.C. § 1125(c))

**(Against Defendants Oligarch, LLC, DMA Financial Corp., Natasha Zukovski, Leah Garrett, Nick Pinkowski, Darrin Landau, Alexander Zukovski, Gregory Zukovski, , and Does 1 through 50, inclusive)**

134.    Plaintiffs incorporate by this reference each and every allegation set forth in the preceding paragraphs of this Complaint, as if fully set forth herein.

135.    Plaintiffs were the first to actually use the registered marks described herein in commerce, and Plaintiffs own or are the exclusive licensee for their respective periods of those marks.

136.     Plaintiffs' marks are distinctive and famous within the meaning of the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c), for the following reasons:

        a.    Plaintiffs' marks are distinctive and are provocative phrases that are not merely descriptive;

        b.    Plaintiffs' marks are used extensively in connection with satellite radio and Internet advertising for Plaintiffs' goods and services;

        c.    Plaintiffs' marks are recognized widely among the general consuming public because of the unsolicited attention given by news media to Plaintiffs' business associated with the marks;

        d.    Prior to Defendants' infringing conduct, no other party used a marks similar to Plaintiffs' marks; and

        e.    Two of Plaintiffs' marks – MUTUALLY BENEFICIAL RELATIONSHIPS and SEEKING ARRANGEMENT – are protected by incontestable federal trademark registrations.

137.    Defendants have used marks identical or confusingly similar to Plaintiffs' marks in commerce in connection with the selling and offering for sale services that compete directly with Plaintiffs' business.

138.   On information and belief, Defendants' use of the trademarks identical or confusingly similar to Plaintiffs' trademarks in commerce occurred after Plaintiffs' trademarks became famous or distinctive.

139.   Defendants' use of the trademarks identical or confusingly similar to Plaintiffs' trademarks dilutes the distinctive quality of Plaintiffs' trademarks as it causes and can cause confusion among customers and potential customers of Plaintiff.

140.   Defendants' use of marks identical or confusingly similar to Plaintiffs' trademarks causes dilution by blurring of Plaintiffs' famous marks by impairing the distinctiveness of Plaintiffs' marks.

141.   Defendants' use of marks identical or confusingly similar to Plaintiffs' trademarks also tarnishes Plaintiffs' marks by harming the reputation of Plaintiffs' famous marks.

142.   Defendants' use of marks identical or confusingly similar to Plaintiffs' trademarks has caused or will cause consumers to view Plaintiffs' marks as generic terms referring to sugar daddy dating.

143.   Defendants' use of marks identical or confusingly similar to Plaintiffs' trademarks in commerce first occurred after October 6, 2006.

144.   Defendants willfully intended to trade on the recognition of Plaintiffs' famous marks and willfully intended to harm the reputation of Plaintiffs' famous marks.

145.   Defendants' use of marks identical or confusingly similar to Plaintiffs' trademarks has caused, and will continue to cause, irreparable harm and injury to Plaintiffs and to Plaintiffs' trademarks, reputation and goodwill for which Plaintiffs have no adequate remedy at law.  The threat of future injury to Plaintiffs' trademarks, business, identity, goodwill and reputation necessitates the award of injunctive relief to prevent Defendants' continued misuse of Plaintiffs' marks.

146.   Defendants have unjustly profited from their foregoing conduct.

147.   As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained damages in an amount to be proven at trial, but estimated to exceed $2,000,000.

148.   Defendants' foregoing conduct constitutes an exceptional case and is intentional,

1    entitling Plaintiffs to treble its actual damages and to an award of attorneys' fees.

2    **FIFTH CAUSE OF ACTION**

3    **BREACH OF CONTRACT**

4    **(Against Defendants Oligarch, LLC, DMA Financial Corp., Natasha Zukovski, Leah**
     **Garrett, Nick Pinkowski, Darrin Landau, Alexander Zukovski, Gregory Zukovski, and**
5    **Does 1 through 50, inclusive)**

6        149.    Plaintiffs incorporate by this reference each and every allegation set forth in the

7    preceding paragraphs of this Complaint, as if fully set forth herein.

8        150.    By using and/or registering to use the SeekingArrangement.com website and

9    service, Defendants, by themselves and/or through agents acting within their authorized scope of

10   employment, consented to the SeekingArrangement.com Terms of Use, thereby entering into a

11   valid contract with Plaintiff.

12       151.    Copying, modifying, publishing, transmitting, distributing, performing, displaying

13   and/or selling Plaintiffs' trademark, trade dress, and other proprietary information constitutes a

14   breach of the Terms of Use.

15       152.    Defendants' conduct as alleged herein, including, *inter alia*, the unauthorized use

16   and infringement of Plaintiffs' trademark and trade dress, constitutes a breach of the Terms of

17   Use.

18       153.    Defendants' breach of the Terms of Use has actually and proximately caused

19   Plaintiffs damages in an amount to be proven at trial, but estimated to exceed $2,000,000.

20   **SIXTH CAUSE OF ACTION**

21   **BREACH OF CONTRACT**

22   **(Against Defendants Devanand Sharma and Kirsten Johnson)**

23       154.    InfoStream incorporates by this reference each and every allegation set forth in

24   the preceding paragraphs of this Complaint, as if fully set forth herein.

25       155.    Defendant Sharma entered into a Non-Compete Agreement and NDA with

26   InfoStream – both of which are valid and enforceable contracts – in connection with his

27   employment with InfoStream.

28       156.    On information and belief, defendant Sharma breached the Non-Compete

1   Agreement and NDA by disclosing Plaintiffs' confidential information to the other Defendants to

2   assist in the creation and operation of OnMutualTerms.com.

3         157.    Defendant Sharma's breach of the Non-Compete Agreement and NDA has

4   actually and proximately caused InfoStream damage in an amount to be proven at trial, but

5   estimated to exceed $2,000,000.

6         158.    Defendant Johnson entered into a Non-Compete Agreement and NDA with

7   InfoStream – both of which are valid and enforceable contracts – in connection with her

8   employment with Plaintiff.

9         159.    On information and belief, defendant Johnson breached the Non-Compete

10  Agreement and NDA by accepting the position of Public Relations/Marketing Manager for

11  OnMutualTerms.com and by disclosing Plaintiffs' confidential information to the other

12  Defendants to assist in the creation and operation of OnMutualTerms.com.

13        160.    Defendant Johnson's breach of the Non-Compete Agreement and NDA has

14  actually and proximately caused InfoStream damage in an amount to be proven at trial, but

15  estimated to exceed $2,000,000.

16                     **SEVENTH CAUSE OF ACTION**

17           **MISAPPROPRIATION OF TRADE SECRETS**

18                    **(Against All Defendants)**

19         161.    Plaintiffs incorporate by this reference each and every allegation set forth in the

20  preceding paragraphs of this Complaint, as if fully set forth herein.

21         162.    As an employee of Plaintiff, defendant Sharma had access to Plaintiffs' trade

22  secrets, including, but not limited to, website source-code, database structures, marketing

23  methodologies, and operating processes.

24         163.    As an employee of Plaintiff, defendant Johnson had access to Plaintiffs' trade

25  secrets, including, but not limited to, public relations and marketing information and materials,

26  strategic plans and media contact emails.

27         164.    The foregoing trade secrets are valuable to Plaintiffs, and Plaintiffs took measures

28  to protect its trade secrets, including having its employees sign Non-Compete Agreements and

1  NDAs.

2  165.   Defendants Sharma and Johnson misappropriated Plaintiffs' trade secrets by

3  disclosing them to the other Defendants.  Such disclosure was wrongful because defendants

4  Sharma and Johnson had a duty not to disclose Plaintiffs' trade secrets under the Non-Compete

5  Agreements and NDAs they executed in connection with their employment by Plaintiff.

6  166.   The other Defendants named herein also misappropriated Plaintiffs' trade secrets

7  by using and/or disclosing Plaintiffs' trade secrets disclosed by defendants Sharma and Johnson

8  in the creation and operation of the website, OnMutualTerms.com, with the knowledge that

9  defendants Sharma and Johnson had a duty not to disclose Plaintiffs' trade secrets to Defendants.

10  167.   Defendants have unjustly profited from their foregoing conduct.

11  168.   Defendants' misappropriation of Plaintiffs' trade secrets has caused, and will

12  continue to cause, irreparable harm and injury to Plaintiffs for which Plaintiffs have no adequate

13  remedy at law, thereby necessitating injunctive relief to prevent Defendants' continued

14  misappropriation of Plaintiffs' trade secrets.

15  169.   As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained

16  damages in an amount to be proven at trial, but estimated to exceed $2,000,000.

17  170.   Defendants' actions are willful, oppressive and malicious, therefore justifying an

18  award of punitive damages against Defendants in an amount sufficient to punish them and to

19  deter similar conduct in the future, as well as an award of attorneys' fees.

20  **EIGHTH CAUSE OF ACTION**

21  **TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

22  **(Against Defendants Oligarch, LLC, Cobia Systems, Inc., DMA Financial Corp., Forlex
    Sales, Inc., Natasha Zuovski, Leah Garrett, Nick Pinkowski, Darrin Landau, Alexander**
23  **Zukovski, Gregory Zukovski, Vibra Jessen, and Does 1 through 50, inclusive)**

24  171.   InfoStream incorporates by this reference each and every allegation set forth in

25  the preceding paragraphs of this Complaint, as if fully set forth herein.

26  172.   InfoStream entered into valid contracts with defendants Sharma and Johnson,

27  namely the Non-Compete Agreement and NDA, whereby defendants Sharma and Johnson both

28  agreed, *inter alia*, (i) for a period of two years post-termination, not to engage directly or

indirectly in any competing business; (ii) to return to InfoStream all documents and other materials relating to Plaintiffs' business post-termination; and (iii) not to disclose Plaintiffs' confidential information to any other person or competitor business.

173.    On information and belief, Defendants knew about the Non-Compete Agreements and NDAs defendants Sharma and Johnson entered into with Plaintiff.

174.    Notwithstanding their knowledge of the Non-Compete Agreements and NDAs, Defendants intentionally induced defendants Sharma and Johnson to breach those agreements by, *inter alia*, (i) hiring defendant Johnson to serve as the Public Relations/Marketing Manager for OnMutualTerms.com, a website that directly competes with Plaintiff; (ii) encouraging defendants Sharma and Johnson not to return the confidential materials and information stolen from InfoStream in violation of the Non-Compete Agreements and NDAs; (iii) encouraging defendants Sharma and Johnson to disclose Plaintiffs' confidential and proprietary information to Defendants for use in creating and operating OnMutualTerms.com; and (iv) using Plaintiffs' confidential and proprietary information wrongfully provided by defendants Sharma and Johnson to compete against Plaintiff.

175.    Defendants' foregoing conduct caused an actual disruption and breach of the Non-Compete Agreements and NDAs.

176.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial, but estimated to exceed $2,000,000.

177.    Defendants' actions are willful, oppressive and malicious, therefore justifying an award of punitive damages against Defendants in an amount sufficient to punish them and to deter similar conduct in the future.

178.    Defendants' acts complained of herein have damaged and will continue to damage Plaintiffs irreparably.  Plaintiffs have no adequate remedy at law for these wrongs and injuries. The harm to Plaintiffs includes the disclosure of Plaintiffs' confidential, proprietary information to a direct competitor.  InfoStream is therefore entitled to an injunction restraining and enjoining Defendants and their agents, servants, and employees, and all persons acting thereunder, in concert with them, or on their behalf, from (1) employing defendant Sharma and/or defendant

Johnson in any capacity; (2) using any of Plaintiffs' confidential information in connection with any product or service, in any medium; and (3) requiring Defendants to return any confidential materials provided to them by defendant Sharma and/or defendant Johnson.

## NINTH CAUSE OF ACTION

## AN ACCOUNTING

**(Against Defendants Oligarch, LLC, DMA Financial Corp., Natasha Zukovski, Leah Garrett, Nick Pinkowski, Darrin Landau, Alexander Zukovski, and Gregory Zukovski)**

179.   Plaintiffs incorporate by this reference each and every allegation set forth in the preceding paragraphs of this Complaint, as if fully set forth herein.

180.   On information and belief, Defendants have received, and continue to receive, substantial revenues from the use and exploitation of Plaintiffs' mark, trade dress or similarly confusing use of that trademark or trade dress.

181.   Plaintiffs are entitled to a full accounting of all revenues received by Defendants in connection with the infringing use of Plaintiffs' mark, trade dress or similarly confusing use of that trademark or trade dress.

182.   Accordingly, the full and precise amount owed and becoming due to InfoStream can only be determined pursuant to a full and accurate accounting of all gross proceeds generated from and expenses incurred, by or in connection with the unauthorized exploitation of Plaintiffs' mark, trade dress or similarly confusing use of that trademark or trade dress.

## PRAYER FOR JUDGMENT

WHEREFORE, Plaintiffs prays that this Court grant it the following relief:

1.   Adjudge that Plaintiffs' mark has been infringed by Defendants in violation of Plaintiffs' rights under 15 U.S.C. § 1114;

2.   Adjudge that Defendants have competed unfairly with Plaintiffs in violation of Plaintiffs' rights under 15 U.S.C. § 1125.

3.   Adjudge that Defendants' activities are likely to, or have, diluted Plaintiffs' famous marks in violation of Plaintiffs' rights under 15 U.S.C. § 1125(c);

///

4.      Adjudge that Defendants are legally bound by SeekingArrangement.com's Terms of Use and have breached the terms therein;

5.      Adjudge that Defendants and each of its agents, employees, attorneys, successors, assigns, affiliates, and joint ventures and any person(s) in active concert or participation with them, and/or persona(s) acting for, with, by, through or under them, be enjoined and restrained at first during the pendency of this action and thereafter permanently from:

a.      Selling, offering for sale distributing, advertising, or promoting any goods or services that display any words or symbols that so resemble or are confusingly similar to Plaintiffs' marks, or the look and feel of SeekingArrangement.com, as to be likely to cause confusion, mistake or deception, on or in connection with any goods or services that are not authorized by or for Plaintiff;

b.      Using Plaintiffs' marks, any other marks or domain names confusingly similar to those marks alone or in combination with any other letters, words, letter strings, phrases or designs, or the look and feel of SeekingArrangement.com in commerce or in connection with any goods or services;

c.      Using any word, term, name, symbol, device or combination thereof that causes or is likely to cause confusion, mistake or deception as to the affiliation or association of Defendants or its goods with Plaintiffs or as to the origin of Defendants' goods or services, or any false designation of origin, false or misleading description or representation of fact;

d.      Further infringing the rights of Plaintiffs in and to any of its trademarks, trade dress, products and services or otherwise damaging Plaintiffs' goodwill or business reputation;

e.      Employing defendant Sharma and/or defendant Johnson in any capacity;

f.      Using any of Plaintiffs' confidential information in connection with any product or service, in any medium;

g.      Otherwise competing unfairly with Plaintiffs in any manner; and

///

h.    Continuing to perform in any manner whatsoever any of the other acts complained of in the Complaint;

6.    Adjudge that Defendants be required to return any confidential matrials provided to them by defendant Sharma and/or defendant Johnson.

7.    Adjudge that Defendants be required immediately to supply Plaintiffs' counsel with a complete list of individuals and entities from whom or which it purchased, and to whom or which it sold, offered for sale, distributed, advertised or promoted, infringing goods and services as alleged in this Complaint;

8.    Adjudge that Defendants, within thirty (30) days after service of the Judgment demanded herein, be required to file with this Court and serve upon Plaintiffs' counsel a written report under oath setting forth in detail the manner in which it has complied with the Judgment;

9.    Adjudge that Plaintiffs recover from Defendants its actual damages and lost profits in an amount to be determined at trial, but estimated to exceed $2,000,000, for Defendants' violations of 15 U.S.C. §§ 1114 and 1125; that Defendants be required to account for any profits that are attributable to its illegal acts; and that Plaintiffs be awarded the greater of (1) three times Defendants' profits or (2) three times any damages sustained by Plaintiffs under 15 U.S.C § 1117, plus prejudgment interest;

10.    Impose a constructive trust on all Defendants' fund and assets that arise out of Defendants' infringing activities;

11.    Adjudge that InfoStream recovers from Defendants its actual damages resulting from breach of their respective contracts in an amount to be proven at trial, but estimated to exceed $2,000,000;

12.    Adjudge that Plaintiffs recover from Defendants its damages caused by Defendants' misappropriation of Plaintiffs' trade secrets, as well as punitive damages and attorneys' fees;

13.    Adjudge that InfoStream recovers from Defendants its damages resulting from Defendants' tortious interference with Plaintiffs' contractual relations in an amount to be proven at trial, but estimated to exceed $2,000,000, as well as punitive damages;

14.     Adjudge that Plaintiffs be awarded its costs and disbursement incurred in connection with this action, including Plaintiffs' reasonable attorneys' fees and investigative expenses; and

15.     Adjudge that all such other relief be awarded to Plaintiffs as this Court deems just and proper.

Dated this 17th day of June, 2015.

A.M. SANTOS LAW, CHTD.

Antony M. Santos, Esq.
Nevada Bar No. 11265
3275 S. Jones Blvd. Ste. 104
Las Vegas, Nevada  89146
Telephone: (702) 749-4594
Facsimile: (702) 543-4855
tony@amsantoslaw.com

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Dated this 17th day of June, 2015.

A.M. SANTOS LAW, CHTD.

Antony M. Santos, Esq.
Nevada Bar No. 11265
3275 S. Jones Blvd. Ste. 104
Las Vegas, Nevada  89146
Telephone: (702) 749-4594
Facsimile: (702) 543-4855
tony@amsantoslaw.com

EXHIBIT "1"

# EMPLOYEE NON-COMPETE AGREEMENT

This Employee Non-Compete Agreement (the "Agreement") is made effective as of January 31, 2009, by and between InfoStream Group Inc. (the "Employer") and Devanand Sharma (the "Employee") (collectively referred to as the "Parties").

For good consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

**1. CONFLICTING EMPLOYMENT:** Employee agrees that during the time of his employment with Employer, he/she will not accept nor will he/she engage in employment, consulting or other business activity directly related to the business of the Employer, with the exception of the list of consulting projects or business activities disclosed in a separately attached sheet.

what-i .com, our city center uc

**2. NON-COMPETE:** Following the termination of employment with Employer for any reason, Employee agrees not to engage directly or indirectly in any business substantially similar to or in competition with the business of the Employer, it successors or assigns for a period of two years.

For purposes of this agreement, engaging in "any business substantially similar to, or in competition with the business of Employer" shall mean: (i) engaging in a business as an owner, partner or agent; (ii) taking employment with a third party engaged in such business either as an employee, contractor or consultant; or (iii) soliciting customers for the benefit of a third party engaged in such business.

**3. NON-SOLICITATION OF EMPLOYEES:** Employee agrees that for a period of two years following the termination of his/her employment with Employer, Employee will not induce, recruit or solicit any of the Employer's employees to terminate their employment or enter into another employment arrangement with Employee or a third party.

**4. CONFIDENTIALITY:** Employee acknowledges that Employer shall or may, in reliance upon this Agreement, grant Employee access to Employer's confidential and proprietary information. Employee agrees to not disclose to any other person (unless required by law) or use for personal gain any such confidential or proprietary information at any time during or after the termination of employment, unless Employer grants express, written consent of such a disclosure.

**5. CONTINUING OBLIGATIONS:** Notwithstanding the termination of Employee for any reason, Sections 1, 2, 3 and 4 of this Agreement will continue in full force and effect following such termination.

**6. BINDING EFFECT:** The covenants and conditions contained in the Agreement shall apply to and bind the Parties and the heirs, legal representatives, successors and permitted assigns of the Parties.

**7. WAIVER:** The failure of either party to enforce any provisions of this Agreement shall not be deemed a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**8. SEVERABILITY:** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

**9. ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the Parties and supersedes any prior understanding or representation of any kind preceding the date of this Agreement. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement. This Agreement may be modified in writing and must be signed by both Employee and Employer.

**10. GOVERNING LAW:** This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.


IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written.


**EMPLOYER:**


Name: Mr. Lead Wey
Position: CEO


**EMPLOYEE:**


Devanand Sharma                            1/30/2009
Social Security #        4036


Employee Non-Compete Agreement – IS013009 Version                                    2

## LIST OF PROJECTS / BUSINESS ACTIVITIES EXCEPTIONS

① What-i.com
② Our City Center   LLC

EXHIBIT "2"

# CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT FOR EMPLOYEE

This CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT (the "Agreement") is made between InfoStream Group Inc. (the "Company") and the undersigned employee.

In consideration of my employment with the Company (which for purposes of this Agreement shall be deemed to include any subsidiaries or Affiliates* of the Company), the receipt of confidential information while associated with the Company, and other good and valuable consideration, I, the undersigned individual, agree that:

1. <u>Term of Agreement</u>. This Agreement shall continue in full force and effect for the duration of my employment by the Company (the "Period of Employment") and shall continue thereafter as otherwise provided in this Agreement.

2. <u>Confidentiality</u>.

(a) <u>Definitions</u>. "Proprietary Information" is all information and any idea whatever form, tangible or intangible, pertaining in any manner to the business of the Company, or any of its Affiliates, or its employees, clients, consultants, or business associates, which was produced by any employee or consultant of the Company in the course of his or her employment or consulting relationship or otherwise produced or acquired by or on behalf of the Company. All Proprietary Information not generally known outside of the Company's organization, and all Proprietary Information so known only through improper means, shall be deemed "Confidential Information." By example and without limiting the foregoing definition, Proprietary and Confidential Information shall include, but not be limited to:

(1) formulas, research and development techniques, processes, trade secrets, computer programs, software, electronic codes, mask works, inventions, innovations, patents, patent applications, discoveries, improvements, data, know-how, formats, test results, and research projects;

(2) information about costs, profits, markets, sales, contracts and lists of customers, and distributors;

(3) business, marketing, and strategic plans;

---

* For purposes of this agreement, "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with the Company.

DOCSSF1:231899.1
Form 6.11

(4) forecasts, unpublished financial information, budgets, projections, and customer identities, characteristics and agreements; and

(5) employee personnel files and compensation information.

Confidential Information is to be broadly defined, and includes all information that has or could have commercial value or other utility in the business in which the Company is engaged or contemplates engaging, and all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Confidential Information by the Company.

(b) <u>Existence of Confidential Information</u>. The Company owns and has developed and compiled, and will develop and compile, certain trade secrets, proprietary techniques and other Confidential Information which have great value to its business. This Confidential Information includes not only information disclosed by the Company to me, but also information developed or learned by me during the course of my employment with the Company.

(c) <u>Protection of Confidential Information</u>. I will not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any third party, other than in my assigned duties and for the benefit of the Company, any of the Company's Confidential Information, either during or after my employment with the Company. In the event I desire to publish the results of my work for the Company through literature or speeches, I will submit such literature or speeches to the President and CEO of the Company at least 10 days before dissemination of such information for a determination of whether such disclosure may alter trade secret status, may be highly prejudicial to the interests of the Company, or may constitute an invasion of its privacy. I agree not to publish, disclose or otherwise disseminate such information without prior written approval of the President and/or CEO of the Company. I acknowledge that I am aware that the unauthorized disclosure of Confidential Information of the Company may be highly prejudicial to its interests, an invasion of privacy, and an improper disclosure of trade secrets.

(d) <u>Delivery of Confidential Information</u>. Upon request or when my employment with the Company terminates, I will immediately deliver to the Company all copies of any and all materials and writings received from, created for, or belonging to the Company including, but not limited to, those which relate to or contain Confidential Information.

(e) Location and Reproduction. I shall maintain at my work station and/or any other place under my control only such Confidential Information as I have a current "need to know." I shall return to the appropriate person or location or otherwise properly dispose of Confidential Information once that need to know no longer exists. I shall not make copies of or otherwise reproduce Confidential Information unless there is a legitimate business need of the Company for reproduction.

(f) Prior Actions and Knowledge. I represent and warrant that from the time of my first contact with the Company I held in strict confidence all Confidential Information and have not disclosed any Confidential Information, directly or indirectly, to anyone outside the Company, or used, copied, published, or summarized any Confidential information, except to the extent otherwise permitted in this Agreement.

(g) Third-Party Information. I acknowledge that the Company has received and in the future will receive from third parties their confidential information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree that, during the Period of Employment and thereafter, I will hold all such confidential information in the strictest confidence and not to disclose or use it, except as necessary to perform my obligations hereunder and as is consistent with the Company's agreement with such third parties.

(h) Third Parties. I represent that my employment with the Company does not and will not breach any agreements with or duties to a former employer or any other third party. I will not disclose to the Company or use on its behalf any confidential information belonging to others and I will not bring onto the premises of the Company any confidential information belonging to any such party unless consented to in writing by such party.

3. Proprietary Rights, Inventions and New Ideas.

(a) Definition. The term "Subject Ideas or Inventions" includes any and all ideas, processes, trademarks, service marks, inventions, designs, technologies, computer hardware or software, original works of authorship, formulas, discoveries, patents, copyrights, copyrightable works products, marketing and business ideas, and all improvements, know-how, data, rights, and claims related to the foregoing that, whether or not patentable, which are conceived, developed or created which: (1) relate to the Company's current or contemplated business or activities; (2) relate to the Company's actual or demonstrably anticipated research or development; (3) result from any work performed by me for the Company; (4) involve the use of the Company's equipment, supplies, facilities or trade secrets; (5) result from or are suggested by any work done by the Company or at the Company's request, or any projects specifically assigned to

me; or (6) result from my access to any of the Company's memoranda, notes, records, drawings, sketches, models, maps, customer lists, research results, data, formulae, specifications, inventions, processes, equipment or other materials (collectively, "Company Materials").

(b) Company Ownership. All right, title and interest in and to all Subject Ideas and Inventions, including but not limited to all registrable and patent rights which may subsist therein, shall be held and owned solely by the Company, and where applicable, all Subject Ideas and Inventions shall be considered works made for hire. I shall mark all Subject Ideas and Inventions with the Company's copyright or other proprietary notice as directed by the Company and shall take all actions deemed necessary by the Company to protect the Company's rights therein. In the event that the Subject Ideas and Inventions shall be deemed not to constitute works made for hire, or in the event that I should otherwise, by operation of law, be deemed to retain any rights (whether moral rights or otherwise) to any Subject Ideas and Inventions, I agree to assign to the Company, without further consideration, my entire right, title and interest in and to each and every such Subject Idea and Invention.

(c) Maintenance of Records. I agree to keep and maintain adequate and current written records of all Subject Ideas and Inventions and their development made by me (solely or jointly with others) during the term of my employment with the Company. These records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. These records will be available to and remain the sole property of the Company at all times.

(d) Determination of Subject Ideas and Inventions. I further agree that all information and records pertaining to any idea, process, trademark, service mark, invention, technology, computer hardware or software, original work of authorship, design, formula, discovery, patent, copyright, product, and all improvements, know-how, rights, and claims related to the foregoing ("Intellectual Property"), that I do not believe to be a Subject Idea or Invention, but that is conceived, developed, or reduced to practice by the Company (alone by me or with others) during the Period of Employment and for one (1) year thereafter, shall be disclosed promptly by me to the Company (such disclosure to be received in confidence). The Company shall examine such information to determine if in fact the Intellectual Property is a Subject Idea or Invention subject to this Agreement.

(e) Access. Because of the difficulty of establishing when any Subject Ideas or Inventions are first conceived by me, or whether it results from my access to Confidential Information or Company Materials, I agree that any Subject Idea and Invention shall, among other circumstances, be deemed to have resulted from my access to Company

Materials if: (1) it grew out of or resulted from my work with the Company or is related to the business of the Company, and (2) it is made, used, sold, exploited or reduced to practice, or an application for patent, trademark, copyright or other proprietary protection is filed thereon, by me or with my significant aid, within one year after termination of the Period of Employment.

(f) _Assistance_.   I further agree to assist the Company in every proper way (but at the Company's expense) to obtain and from time to time enforce patents, copyrights or other rights or registrations on said Subject Ideas and Inventions in any and all countries, and to that end will execute all documents necessary:

(1) to apply for, obtain and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(2) to defend any opposition proceedings in respect of such applications and any opposition proceedings or petitions or applications for revocation of such letters patent, copyright or other analogous protection; and

(3) to cooperate with the Company (but at the Company's expense) in any enforcement or infringement proceeding on such letters patent, copyright or other analogous protection.

(g) _Authorization to Company_.   In the event the Company is unable, after reasonable effort, to secure my signature on any patent, copyright or other analogous protection relating to a Subject Idea and Invention, whether because of my physical or mental incapacity or for any other reason whatsoever, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf and stead to execute and file any such application, applications or other documents and to do all other lawfully permitted acts to further the prosecution, issuance, and enforcement of letters patent, copyright or other analogous rights or protections thereon with the same legal force and effect as if executed by me.   My obligation to assist the Company in obtaining and enforcing patents and copyrights for Subject Ideas and Inventions in any and all countries shall continue beyond the termination of my relationship with the Company, but the Company shall compensate me at a reasonable rate after such termination for time actually spent by me at the Company's request on such assistance.

(h) _Exhibit_.   I acknowledge that there are no currently existing ideas, processes, inventions, discoveries,

marketing or business ideas or improvements which I desire to exclude from the operation of this Agreement, unless a reference thereto has been attached as an exhibit hereto.   To the best of my knowledge, there is no other contract to assign inventions, trademarks, copyrights, ideas, processes, discoveries or other intellectual property that is now in existence between me and any other person (including any business or governmental entity).

(i) _No Use of Name_.   I shall not at any time use the Company's name or any the Company trademark(s) or trade name(s) in any advertising or publicity without the prior written consent of the Company.

4.   _Competitive Activity_.

(a) _Acknowledgment_.   I acknowledge that the pursuit of the activities forbidden by Section 4(b) below would necessarily involve the use, disclosure or misappropriation of Confidential Information.

(b) _Prohibited Activity_.   To prevent the above-described disclosure, misappropriation and breach, I agree that during my employment and for a period of one (1) year after termination of the Period of Employment, without the Company's express written consent, I shall not, directly or indirectly, (i) employ, solicit for employment, or recommend for employment any person employed by the Company (or any Affiliate); and (ii) engage in any present or contemplated business activity that is or may be competitive with the Company (or any Affiliate) in any state where the Company conducts its business, unless I can prove that any action taken in contravention of this subsection (ii) was done without the use in any way of Confidential Information.

5.   _Representations and Warranties_.   I represent and warrant (i) that I have no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with my undertaking a relationship with the Company; (ii) that the performance of the services called for by this Agreement do not and will not violate any applicable law, rule or regulation or any proprietary or other right of any third party; (iii) that I will not use in the performance of my responsibilities for the Company any materials or documents of a former employer; and (iv) that I have not entered into or will enter into any agreement (whether oral or written) in conflict with this Agreement.

6.   _Termination Obligations_.

(a)   Upon the termination of my relationship with the Company or promptly upon the Company's request, I shall surrender to the Company all equipment, tangible Proprietary Information, documents, books, notebooks, records, reports, notes, memoranda, drawings, sketches, models, maps, contracts, lists, computer disks (and other computer-generated

DOCSSF1:231899.1
Form 6.11

files and data), any other data and records of any kind, and copies thereof (collectively, "Company Records"), created on any medium and furnished to, obtained by, or prepared by myself in the course of or incident to my employment, that are in my possession or under my control.

(b) My representations, warranties, and obligations contained in this Agreement shall survive the termination of the Period of Employment.

(c) Following any termination of the Period of Employment, I will fully cooperate with the Company in all matters relating to my continuing obligations under this Agreement.

(d) In the event that I leave the employ of the Company I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

(e) Upon termination of the Period of Employment, I will execute a Certificate acknowledging compliance with this Agreement in the form reasonably provided by the Company.

7. Injunctive Relief. I acknowledge that my failure to carry out any obligation under this Agreement, or a breach by me of any provision herein, will constitute immediate and irreparable damage to the Company, which cannot be fully and adequately compensated in money damages and which will warrant preliminary and other injunctive relief, an order for specific performance, and other equitable relief. I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance. I also understand that other action may be taken and remedies enforced against me.

8. Modification. No modification of this Agreement shall be valid unless made in writing and signed by both parties.

9. Binding Effect. This Agreement shall be binding upon me, my heirs, executors, assigns and administrators and is for the benefit of the Company and its successors and assigns.

10. Governing Law. This Agreement shall be construed in accordance with, and all actions arising under or in connection therewith shall be governed by, the internal laws of the State of Nevada (without reference to conflict of law principles).

11. Integration. This Agreement sets forth the parties' mutual rights and obligations with respect to proprietary information, prohibited competition, and intellectual property. It is intended to be the final, complete, and exclusive statement of the terms of the parties' agreements regarding these subjects. This Agreement supersedes all other prior and contemporaneous agreements and statements on these subjects, and it may not be contradicted by evidence of any prior or contemporaneous statements or agreements. To the extent that the practices, policies, or procedures of the Company, now or in the future, apply to myself and are inconsistent with the terms of this Agreement, the provisions of this Agreement shall control unless changed in writing by the Company.

12. Employment at Will. This Agreement is not an employment agreement. I understand that the Company may terminate my association or employment with it at any time, with or without cause, subject to the terms of any separate written employment agreement executed by a duly authorized officer of the Company.

13. Construction. This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party. By way of example and not limitation, this Agreement shall not be construed against the party responsible for any language in this Agreement. The headings of the paragraphs hereof are inserted for convenience only, and do not constitute part of and shall not be used to interpret this Agreement.

14. Attorneys' Fees. Should either I or the Company, or any heir, personal representative, successor or permitted assign of either party, resort to legal proceedings to enforce this Agreement, the prevailing party (as defined in California statutory law) in such legal proceeding shall be awarded, in addition to such other relief as may be granted, attorneys' fees and costs incurred in connection with such proceeding.

15. Severability. If any term, provision, covenant or condition of this Agreement, or the application thereof to any person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other persons, places and circumstances shall remain in full force and effect.

16. Rights Cumulative. The rights and remedies provided by this Agreement are cumulative, and the exercise of any right or remedy by either the Company or me (or by that party's successor), whether pursuant hereto, to any other agreement, or to law, shall not preclude or waive that party's right to exercise any or all other rights and remedies. This Agreement will inure to the benefit of the Company and its successors and assigns.

17. Nonwaiver. The failure of either the Company or me, whether purposeful or otherwise, to exercise in any

instance any right, power or privilege under this Agreement or under law shall not constitute a waiver of any other right, power or privilege, nor of the same right, power or privilege in any other instance. Any waiver by the Company or by me must be in writing and signed by either myself, if I am seeking to waive any of my rights under this Agreement, or by an officer of the Company (other than me) or some other person duly authorized by the Company.

18. <u>Notices</u>. Any notice, request, consent or approval required or permitted to be given under this Agreement or pursuant to law shall be sufficient if it is in writing, and if and when it is hand delivered or sent by regular mail, with postage prepaid, to my residence (as noted in the Company's records), or to the Company's principal office, as the case may be.

19. <u>Date of Effectiveness</u>. This Agreement shall be deemed effective as of the commencement of my employment with the Company.

20. <u>Agreement to Perform Necessary Acts</u>. I agree to perform any further acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

21. <u>Assignment</u>. This Agreement may not be assigned without the Company's prior written consent.

22. <u>Compliance with Law</u>. I agree to abide by all federal, state, and local laws, ordinances and regulations.

23. <u>Employee Acknowledgment</u>. I acknowledge that I have had the opportunity to consult legal counsel in regard to this Agreement, that I have read and understand this Agreement, that I am fully aware of its legal effect, and that I have entered into it freely and voluntarily and based on my own judgment and not on any representations or promises other than those contained in this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date set forth below.

CAUTION: THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS OF TRUST AND AFFECTS THE EMPLOYEE'S RIGHTS TO INVENTIONS AND OTHER INTELLECTUAL PROPERTY THE EMPLOYEE MAY DEVELOP DURING HIS OR HER EMPLOYMENT.

Dated: January 31, 2009

Employee Signature

Printed Name of Employee: <u>Devanand Sharma</u>

Social Security #: ████ 4036

INFOSTREAM GROUP INC.

By: _____

Name: <u>Mr. Lead Wey</u>

Title: <u>CEO</u>

EXHIBIT "3"

# EMPLOYEE NON-COMPETE AGREEMENT

This Employee Non-Compete Agreement (the "Agreement") is made effective as of _June 9_, 20_14_ by and between InfoStream Group Inc. (the "Employer") and _Kirsten Johnson_ (the "Employee") (collectively referred to as the "Parties").

For good consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

**1. CONFLICTING EMPLOYMENT:** Employee agrees that during the time of his employment with Employer, he/she will not accept nor will he/she engage in employment, consulting or other business activity directly related to the business of the Employer, with the exception of the list of consulting projects or business activities disclosed in a separately attached sheet.

**2. NON-COMPETE:** Following the termination of employment with Employer for any reason, Employee agrees not to engage directly or indirectly in any business substantially similar to or in competition with the business of the Employer, it successors or assigns for a period of two years.

For purposes of this agreement, engaging in "any business substantially similar to, or in competition with the business of Employer" shall mean: (i) engaging in a business as an owner, partner or agent; (ii) taking employment with a third party engaged in such business either as an employee, contractor or consultant; or (iii) soliciting customers for the benefit of a third party engaged in such business.

**3. NON-SOLICITATION OF EMPLOYEES:** Employee agrees that for a period of two years following the termination of his/her employment with Employer, Employee will not induce, recruit or solicit any of the Employer's employees to terminate their employment or enter into another employment arrangement with Employee or a third party.

**4. CONFIDENTIALITY:** Employee acknowledges that Employer shall or may, in reliance upon this Agreement, grant Employee access to Employer's confidential and proprietary information. Employee agrees to not disclose to any other person (unless required by law) or use for personal gain any such confidential or proprietary information at any time during or after the termination of employment, unless Employer grants express, written consent of such a disclosure.

**5. CONTINUING OBLIGATIONS:** Notwithstanding the termination of Employee for any reason, Sections 1, 2, 3 and 4 of the Agreement will continue in full force and effect following such termination.

**6. BINDING EFFECT:** The covenants and conditions contained in the Agreement shall apply to and bind the Parties and the heirs, legal representatives, successors and permitted assigns of the Parties.

**7. WAIVER:** The failure of either party to enforce any provisions of this Agreement shall not be deemed a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

**8. SEVERABILITY:** If any part or parts of this Agreement shall be held unenforceable for any reason, the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is deemed invalid or unenforceable by any court of competent jurisdiction, and if limiting such provision would make the provision valid, then such provision shall be deemed to be construed as so limited.

**9. ENTIRE AGREEMENT:** This Agreement constitutes the entire agreement between the Parties and supersedes any prior understandings or representation of any kind preceding the date of this Agreement. There are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Agreement. This Agreement may be modified in writing and must be signed by both Employee and Employer.

**10. GOVERNING LAW & VENUE:** This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. In the event of any legal action to enforce or interpret this Agreement, the sole and exclusive venue shall be a court of competent jurisdiction located in Clark County, Nevada. The parties specifically agree to waive any and all rights to request that an action be transferred for trial to another County.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written.

**EMPLOYEE:**

Kirsten Johnson

Full Name: _____

Social Security #: ▮▮▮▮ 4771

Accepted and Acknowledged

**COMPANY:**

InfoStream Group Employee Handbook

Full Name: Mr. Lead Wey
Title: CEO

## LIST OF PROJECTS / BUSINESS ACTIVITIES EXCEPTIONS

Use this space to list any outside projects or businesses you are currently working on, have worked on in the last 180 days or will work on in the next 180 days. Failure to list any project or business could result in termination and/or legal action should the project or business violate the InfoStream Group non-compete agreement.

EXHIBIT "4"

It is intended that this document shall reflect adequate understanding of your work situation. The dynamic nature of our industry will undoubtedly require changes in this work situation. InfoStream Group reserves the right to amend, modify, rescind, delete, supplement or add to the provisions of this handbook, as it deems appropriate from time to time in its sole and absolute discretion. However, no amendment or modification of the "Terms of Employment" provisions of this handbook shall be effective unless made in writing, and signed by the President of InfoStream Group. InfoStream Group will attempt to provide you with notification of any other changes as they occur.

## RECEIPT AND ACKNOWLEDGEMENT FOR EMPLOYEE HANDBOOK

This is to acknowledge that I have received a copy of the InfoStream Group employee handbook, dated, September 2012. This handbook sets forth the terms and conditions of my employment as well as the rights, duties, responsibilities and obligations of my employment with InfoStream Group. I understand and agree that it is my responsibility to read and familiarize myself with all of the provisions of the handbook. I further understand and agree that I am bound by the provisions of the handbook.

I understand that except for the "Terms of Employment" provisions of this handbook, InfoStream Group reserves the right to amend, modify, rescind, delete, supplement or add to the provisions of this handbook as it deems appropriate from time to time in its sole and absolute discretion. However, no amendment or modification of the "Terms of Employment" provisions of this handbook shall be effective unless made in writing and signed by the President of InfoStream Group. InfoStream Group will attempt to provide you notification of any other changes as they occur.

I understand that nothing in this handbook creates or is intended to create a promise or representation of continued employment and that employment at InfoStream Group is at will. My signature below certifies that I understand the foregoing agreement on at will status is the sole and entire agreement between InfoStream Group and my-self concerning the duration of employment and the circumstances under which my employment may be terminated. It

supersedes all prior agreements, understandings and representations concerning my employment with InfoStream Group.

Date: ___6|9_____, 20 _14_

Signature: _____
         (Employee)

Signature: _____
         (Hiring Supervisor)

# EMPLOYEE CONFIDENTIALITY AND
# NON-DISCLOSURE AGREEMENT

FOR GOOD CONSIDERATION, and in consideration of my employment or continued employment by InfoStream Group Inc. (the "Company"), I, the undersigned employee, hereby agree to the terms of this agreement (the "Agreement"):

1. CONFIDENTIAL INFORMATION

    (a)    Company Information.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Company, any Confidential Information of the Company.  I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings,

engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly.

(b) Exceptions. The foregoing obligations and restrictions do not apply to that part of the Confidential Information that I can demonstrate:

    (i) was available or became generally available to the public other than as a result of a disclosure by me; or

    (ii) was available, or became available, to me on a non-confidential basis prior to its disclosure to me by the Company or a Company representative, but only if such information was no made available through a breach of confidentiality owed to the Company; or

    (iii) was requested or legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demand or similar process) or is required by a regulatory body to make any disclosure which is prohibited or otherwise constrained by this Agreement, provided, that I shall: (A) provide the Company with prompt notice of any such request(s) so that the Company may seek an appropriate protective order or other appropriate remedy: and (B) provide reasonable assistance to the Company in obtaining any such protective order. If such protective order or other remedy is not obtained or the Company grants a waiver hereunder, then I may finish that portion (and only that portion) of the Confidential Information which, in the written opinion of counsel reasonably acceptable to the Company, I am legally compelled or am otherwise required to disclose; provided, that I shall use reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any Confidential Information so disclosed.

(c) Former Employment Information. I agree during my employment with the Company, not to improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(d) Third Party Information. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all

such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

2.   RETURN OF PROPERTY

Upon termination of my employment, I will return to the Company, retaining no copies or notes, all documents relating to the Company's business including, but not limited to, reports, abstracts, lists, correspondence, information, computer files, computer disks, and all other materials and all copies of such materials, obtained by me during my employment with the Company.

3.   NOTIFICATION OF FUTURE EMPLOYER

I hereby grant consent to notification by the Company to any future or prospective employer about any rights and obligations under this Agreement.

4.   LEGAL AND EQUITABLE REMEDIES

I recognize that the Company may be irreparably damaged by any breach of this Agreement and that the Company shall be entitled to seek an injunction, specific performance or other equitable remedy to prevent such competition or disclosure, and may entitle the Company to other legal remedies, including attorney's fees and costs.

5.   SUCCESSORS AND ASSIGNS

This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. I may no assign any of my rights, or delegate any of my obligations, under this Agreement.

6.   CONTINUING OBLIGATIONS

The obligations and rights described in this Agreement shall survive the termination of my employment with the Company.

7.   SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this agreement will be reformed, construed and enforced in such

jurisdiction as if such invalid, illegal or unenforceable provisions had never been contained herein.

8.   COUNTERPARTS / ELECTRONIC SIGNATURES

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. For purposes of this Agreement, use of a facsimile, e-mail or other electronic medium shall have the same force and effect as an original signature.

9.   GOVERNING LAW

This Agreement shall be governed by the laws of the state of Nevada without regard to its conflicts of law provisions. In the event of any legal action to enforce or interpret this Agreement, the sole and exclusive venue shall be a court of competent jurisdiction located in Clark County, Nevada.  The parties specifically agree to waive any and all rights to request that an action be transferred for trial to another County.

IN WITNESS WHEREOF, the parties below hereby execute this Agreement on

_____6|9_____, 20 __14__.

**EMPLOYEE:**

_Kirsten Johnson_____
Full Name:

Social Security #: _██████4771_____

Accepted and Acknowledged

**COMPANY:**

_[signature]_____
Full Name: Mr. Lead Wey
Title: CEO